
Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5565 | **DATE** | 10/4/2000 |
| **CASE TITLE** | TY, INC. vs. PUBLICATIONS INTERNATIONAL | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Motion (46-1) for summary judgment is granted on the copyright claim as to liability alone. Issue of damages withheld pending briefing.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | OCT 06 2000 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | /63 |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |

DW
courtroom deputy's initials

ED-7
FILED FOR DOCKETING
00 OCT -5 PM 12: 41

Date/time received in central Clerk's Office

mailing deputy initials

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

TY, INC.,

    Plaintiff,

        v.

PUBLICATIONS INTERNATIONAL,
LTD.,

    Defendant.

No. 99 C 5565
Judge James B. Zagel



## MEMORANDUM OPINION AND ORDER

Plaintiff, Ty, Inc. (Ty), is in the "plush business." It produces and sells soft toy animals.

Defendant, Publications International, Ltd. (PIL), sells books about collectible toys. Ty sued PIL

for copyright and trademark infringement in connection with PIL's sale of two collector's books

that feature Ty's plush animals. Ty moves for summary judgment on both claims.

A brief description of Ty and its plush business is in order. Ty is elite among plush toy

manufacturers, and indeed among all toy manufacturers. Its star product line, a collection of

bean-bag animals marketed as Beanie Babies®, ranks among the most popular collectible toys of

all time. Ty's creations run the zoological gamut from Peking the panda, to Kiwi the toucan, to

Nanook the Husky, and Stinger the scorpion–just to name a few. Ty holds the exclusive

copyright to around 200 such animals. In addition to holding copyrights for the plush animals

themselves, Ty is also the owner of several trademarks in connection with its plush toy

collection.[1]

---

[1] These include United States Trademarks Registrations for the marks BEANIE BABIES® (Reg. No. 2,049,196), THE BEANIE BABIES COLLECTION® (Reg. No. 2,080,995), and TY HEART DESIGN ® (Reg. No. 1,722,141), among others. Ty also owns the common law trademarks BEANIES, BEANIE BABIES, TEENIE BEANIE BABIES, BEANIE CONNECTION, ORIGINAL BEANIE BABY, and BEANIE BUDDIES.

All in all, over 1 billion Beanie Babies have been sold since 1993. Though the excitement surrounding Beanie Babies has waned somewhat, the public demand for Ty's plush toys reached extraordinary levels in recent years. At stores around the country, Beanie Babies went out of stock just hours after delivery; parents who wanted to buy Beanie Babies for children were forced to make appointments with local retailers. There were even reports of Beanie Baby enthusiasts following UPS trucks from Ty's headquarters to assure first-pick of these coveted toys.[2]

The consumer frenzy over Beanie Babies can be attributed in part to Ty's unique marketing strategy. Ty creates scarcity in the market by selling its products only to small retail stores, and then only in small quantities. In addition, Ty periodically retires different Beanie Babies, taking them out of circulation and thus boosting their market value among collectors. Ty's marketing plan emphasizes the collectible nature of its products, and collectors are constantly on the look out for new Beanie Babies.

A thriving secondary Beanie Babies collector's market has emerged. Beanie Baby enthusiasts trade and sell Ty's products over the Internet, at yard sales, through classified ads, and through collectors' clubs. There have been hundreds–perhaps thousands–of newspaper articles and television news stories discussing the market for Beanie Babies, as well as a proliferation of Beanie-related web sites. Beanie Babies are not the exclusive province of child collectors. Ty's toys are sought after by potential investors who hope to capitalize on the sale of "rare" Babies, some of which fetch thousands of dollars at collectors' auctions.

The extraordinary public demand for Ty's Beanie Babies has resulted in numerous instances of counterfeiting and trademark and copyright infringement. An investigation in New

---

[2] See Pl.'s Mem. in Supp. of its Mot. for Prelim. Inj. Ex. 6.

York City, for example, revealed nearly a quarter of a million fake plush toys, resulting in criminal prosecutions. [Rogers Depo. p. 69]. Unlicensed Beanie Baby-related paraphernalia such as trading cards, children's books, cookbooks, and other publications have become the subject of legal battles. Two such allegedly infringing publications are at the center of this lawsuit.

Defendant, PIL, is an Illinois corporation. PIL's principal business is the production and publication of various books including consumer price guides, children's books, and books about collectibles. In addition, under its registered trademark, Consumer Guide™, PIL publishes books about automobiles.

At issue in this case is whether two of PIL's recent publications, *For the Love of Beanie Babies* and *The Beanie Babies Collector's Guide*, violate Ty's copyright and trademark rights. A brief description of the contents of the allegedly infringing books follows:

(1) Both books feature Ty's registered trademark Beanie Babies® in its title. The words "Beanie Babies" appear in large colorful letters on the cover of both books.

(2) The covers of both books prominently display Ty's products. Tabasco the bull (Reg. No. 724842) and Goldie the Goldfish (Reg. No. 669364) appear on the front cover of *The Beanie Babies Collector's Guide*. Nine Beanie Babies including Inky the octopus and Ants the anteater are on the front cover of *For the Love of Beanie Babies*.

(3) *For the Love of Beanie Babies* contains color photographs of every item in Ty's Beanie Babies plush toy line that was in existence at the time the book was prepared, which amounts to 146 different toys. Photographs of Beanie Babies appear three to a page. Each photograph is accompanied by an explanatory note. In addition, at least twenty-four pages of the book contain color photographs of Beanie Babies in fanciful

group and decorative settings. For example, Ty's plush crab, otter, manatee and whale are featured in an underwater scene accompanied by the caption: "What a wet and wild bunch! These Beanie Babies make waves in their underwater playground."

(4) *The Beanie Babies Collector's Guide* contains color photographs of every item in Ty's Beanie Babies plush toy line that was in existence at the time the book was prepared, which amounts to about 200 toys. Nearly every page of the 160-page book features a large color photograph of a single Beanie Baby against a white background. Each picture is accompanied by an explanatory note which tells the reader its style number, release date, estimated market value, and other unique characteristics. Certain animals are "recommended" or "highly recommended" for purchase. By way of example, the explanatory note next to Seamore the seal reads:

> "Collectors who found Seamore before her October 1, 1997 retirement, were very lucky indeed. She was extremely difficult to find for months before her retirement. As a result, her post-retirement value has skyrocketed well past that of the other Beanies in her retirement class. Finding Seamore in mint condition with clean white plush can be tricky, but collectors who don't already have this seal should get her now. Her price is sure to continue upwards."

About fourteen pages at the beginning of *The Beanie Babies Collector's Guide* are devoted to commentary and advice for collectors. There are historical essays about the origins of Beanie Babies and Ty, Inc. There is advice about which collectibles are tipped to become valuable and cautionary notes about how to avoid counterfeits. There is extensive discussion

about how the condition of each animal's heart-shaped hang tag adds or detracts from the value of the toy.

(5) In both of PIL's books, many of Ty's Beanie Babies are wearing their heart-shaped hang tags featuring the TY HEART® logo.

(6) PIL placed disclaimers on the cover and front page of each of its books. The disclaimer reads: "This publication is not authorized or licensed by Ty, Inc. Publications International, Ltd. is not affiliated with Ty, Inc." The disclaimer on *The Beanie Babies Collector's Guide* is in larger, bolder print than the disclaimer on *For the Love of Beanie Babies*.

(7) In addition to placing a disclaimer on the front cover, PIL used its own trademarks, "Consumer Guide™" and "Favorite Brand Name™" on various editions of *The Beanie Babies Collector's Guide*. PIL placed its own name on the cover of *For the Love of Beanie Babies*.

PIL produced and sold its books for a two-year period from mid-year 1998 until January 2000. During this time, PIL published two editions of *For the Love of Beanie Babies* and four editions of *The Beanie Babies Collector's Guide*. The allegedly infringing books were sold in bookstores such as Barnes & Noble, Borders, Dalton and Walden, and over the Internet.

PIL never obtained or even asked for Ty's permission before publishing its books. PIL's CEO, Louis Weber, testified in deposition that before the allegedly infringing books were published, he obtained the advice of outside counsel who assured him that PIL's books did not violate Ty's intellectual property rights.

Ty has licensed its trademarks and copyrights to other publishers who produce guidebooks and magazines featuring Ty's plush toys. These include the publishers of *Collectors Value Guide for Beanie Babies*, *Encyclo-beaniea*, *My Beanie Baby Binder*, and others. Ty's licensees sell their wares over the Internet and in major supermarkets, drugstores, and bookstores, including Dominicks, Jewel/Osco, Barnes & Noble, and Borders. Ty collects substantial royalties from its licensees.

On August 7, 1998, Ty sent PIL a "cease and desist letter" demanding that the sale of infringing books cease. After receipt of the letter, Mr. Weber states that he again consulted outside counsel who advised him that PIL had a right to continue publishing the books. Between August 1998 and August 1999, PIL and Ty corresponded regarding a possible settlement. The negotiations came to an end when Ty learned that PIL published another edition of *The Beanie Babies Collector's Guide*.

At about the same time, Ty received a letter from one of its licensees, CheckerBee Publishing, complaining about PIL's books. The letter specifically complained that PIL was able to sell its collectors' guides at a substantially reduced price because it was not paying royalties. Soon thereafter, Ty brought this lawsuit against PIL alleging (1) copyright infringement under the Copyright Laws of the United States, 17 U.S.C. § 101 *et seq.*, (2) trademark infringement, unfair competition and dilution under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and (3) common law unfair competition under the laws of the State of Illinois.

I granted Ty's motion for a preliminary injunction on January 24, 2000. *Ty, Inc. v. Publications International, Ltd.*, 81 F. Supp.2d 899 (N.D. Ill. 2000). Ty now moves for summary judgment on its copyright infringement and trademark infringement claims.

6

## I.  SUMMARY JUDGMENT STANDARD

A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden is on the moving party to show that no genuine issues of material fact exist. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once the moving party presents a prima facie showing that he is entitled to judgment as a matter of law, the non-moving party may not rest upon the mere allegations or denials in its pleadings but must set forth specific facts showing that a genuine issue for trial exists. *Anderson*, 477 U.S. at 256-57, 106 S.Ct. 2505.

In a copyright or trademark case, should plaintiff establish a prima facie case of infringement, defendant carries the burden of presenting evidence to support its affirmative defenses. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 (1994).  Summary judgment may be an appropriate remedy in a copyright or trademark infringement suit where the defendant fails to show that there are material questions of fact with respect to its affirmative defenses. *Stewart v. Abend*, 495 U.S. 207, 110 S.Ct. 1750 (1990)(summary judgment for plaintiff in copyright infringement suit); *Blue Ribbon Feed Co. v. Farmer's Union Central Exchange, Inc.*, 731 F.2d 415 (7th Cir. 1984)(summary judgment for plaintiff in trademark infringement suit).

## II.    COPYRIGHT INFRINGEMENT CLAIMS

Ty argues that PIL violated its intellectual property rights under 17 U.S.C. § §§ 101-803 (the Copyright Act of 1976) by publishing and selling its collector's books, each of which contain unauthorized reproductions of Ty's protected works. The Copyright Act grants copyright owners exclusive rights to reproduce the copyrighted work and to prepare derivative works based upon the copyrighted work. See 17 U.S.C. § 106. The manufacture, distribution and/or sale of an unauthorized copy which is substantially similar to a protected work infringes on the copyright in the work. See 17 U.S.C. §§ 106, 501(a), 504. A prima facie case of copyright infringement is established when (1) the plaintiff shows that he owns valid copyrights and (2) defendant copied the protected work. *Wildlife Express Co. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994).

### *Prima Facie Case of Copyright Infringement*

The parties do not dispute that Ty has either applied for or has obtained copyright registrations from the United States Copyright Office for each item in its Beanie Babies® collection. PIL protests that this court does not have before it evidence of which of Ty's Beanie Babies are copyrighted. (Def.'s Resp. to Pl.'s St. of Material Facts ¶ 4). This is not true. Ty has submitted over 160 certificates of registration that correspond to the plush toys featured in PIL's guides. Certificates of registration, such as those attached to Ty's complaint and its Rule 56 Statement of Material Facts, are prima facie evidence of valid copyrights. The fact that the Copyright Office declined to issue separate copyright registrations for a few Beanie Baby toys that were a different color than (but based upon the same pattern as) a previously registered toy, is not material. Those plush toys that were refused copyright registration are still protected

8

derivative works. See Nimmer on Copyright § 7.16 [B][2]. Moreover, PIL has not identified a single Beanie Baby contained in its books that does not have a corresponding certificate of registration. Ty satisfies the first element of a prima facie copyright claim.

There is likewise no dispute that the pictures of Beanie Babies in PIL's books are photographic reproductions of Ty's copyrighted works. Ty has, therefore, established a prima facie case of copyright infringement. *Wildlife Express Co. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994).

### Fair Use Defense

PIL asserts that even if its books copy Ty's protected work, it is protected by the "fair use" doctrine. The Copyright Act of 1976 provides that: "the fair use of a copyrighted work, including use by reproduction in copies . . . for purposes such as criticism, comment, news reporting, teaching . . . scholarship or research, is not an infringement of copyright." 17 U.S.C. § 107. In determining whether a defendant's use of a copyrighted work is fair use, the factors to be considered are: (1) the purpose and character of the use (2) the nature of the copyrighted work (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole, and (4) the effect of the use upon the potential market for or value of the work. *Id.*

### 1. Purpose of the Use

The first fair use factor is the "purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit or educational purposes." 17 U.S.C. §107(1). There are actually two separate inquiries to be conducted here. The first is whether the work is primarily commercial in nature, or whether it aspires to serve broader public purposes. See *Paramount Pictures*, 11 F. Supp.2d 329, 334 (S.D.N.Y. 1998).

While acknowledging the commercial nature of its books (Weber Dep. p.88), PIL argues that the publication of an independent Beanie Babies collector's guide is in the public interest. PIL characterizes Ty as being secretive and unhelpful to Beanie Babies collectors, citing the fact that it "refuses" to authenticate its toys for individual collectors, does not list its name or address in telephone directories, and has a policy against its employees giving interviews. While PIL may have been motivated to some extent by Ty's allegedly objectionable consumer relations practices, PIL is a publishing business, not a consumer protection organization. I find that its books are primarily commercial in nature. See *Paramount Pictures*, 11 F. Supp.2d at 334 (in copyright suit involving a book about the television series, *Star Trek*, the profit inquiry favored plaintiff, even though defendant was partially motivated by a genuine desire to help others understand the idiosyncracies of *Star Trek* fans). While PIL's commercial purpose is a point in Ty's favor, 17 U.S.C. § 107(1), the profit element of the fair use calculus is not itself controlling.

The second part of the inquiry asks whether PIL's books are "transformative." A work is transformative when it adds something new with a "further purpose or different character," altering the protected work "with new expression, meaning, or message." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). PIL claims that its books are transformative works of "comment" or "criticism." In support of this argument, PIL points out that each photograph is accompanied by a paragraph containing important collectors' information including: birth dates, release dates, whether a doll is scarce or common, how the hang tag adds or depreciates the doll's value, and how to avoid counterfeits. PIL's books also contain historical essays on the origins of Beanie Babies, a commentary on the ethics of "re-tagging," and recommendations as to which Babies present the best investment potential. In short, PIL argues, Ty makes plush animals; it makes books of independent commentary.

10

The fact that PIL has chosen to publish books about Beanie Babies does not preclude its reliance on the "comment" or "criticism" prongs of § 107. Commentary and criticism about stuffed animals is, in theory, as eligible for fair use protection as commentary on other, more erudite subjects. *Twin Peaks Productions, Inc. v. Publications International, Ltd.*, 996 F.2d 1366, 1373 (2nd Cir. 1993) ("a comment is as eligible for fair use protection when it concerns 'Masterpiece Theater' as when it concerns 'As the World Turns.'")

The fatal flaw in PIL's "criticism" and "commentary" argument is its failure to adequately address the ratio of infringing photographs to edifying commentary in its books. PIL's use of Ty's protected expression consists of hundreds of color photographs. While some identification of the subject matter of a work of criticism must occur before comment may be made, the sheer number of photographs of Beanie Babies in PIL's books go "far beyond merely identifying their basic outline for the transformative purposes of commentary or criticism." *Twin Peaks*, 996 F.2d at 1375. See also *Paramount Pictures*, 11 F.Supp.2d 329 (S.D.N.Y. 1998)(book containing numerous plot summaries of episodes of television series, *Star Trek*, was not transformative because it "added nothing substantial to the *Star Trek* story"); *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132 (2d Cir. 1998) (book containing 643 trivia questions about episodes of the television series *Seinfeld* was not transformative, but merely an attempt to "repackage *Seinfeld* to entertain *Seinfeld* viewers."); *Horn v. Abbot, Ltd. v. Sarsaparilla Ltd.,* 601 F.Supp. 360, 367 (N.D.Ill. 1984) (book containing copies of *Trivial Pursuit* questions was not transformative; although defendant publisher did "research" the questions and "comment on them," the verbatim use of all 6,000 questions precluded a finding that the book was commentary or criticism).

I also note that this court has previously rejected the argument that the publisher of an unlicensed Beanie Babies collector's guide created a transformative work of criticism. *Ty v. West Highland*, 1998 WL 698922 *13 (N.D. Ill. 1998). Judge Norgle found that, although the defendant's publications included editorial and information, "they also include photographs of Ty's copyrighted products." I agree that "if [defendant's] primary objective was merely to provide some form of editorial comment or information about Beanie Babies, it could have done so without the use of the photographs." *Id.*

PIL's books are essentially Beanie Baby catalogues with a very limited amount of commentary to go with the pictures. The first factor favors Ty.

2.     *Nature of the copyrighted work*

The second factor, "the nature of the copyrighted work," 17 U.S.C. §107(2), calls for recognition of the fact that "some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. In other words, creative works which "owe their origin to an act of authorship" are deemed more deserving of copyright protection than products like catalogues or telephone directories that simply sort and compile facts. *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 364 (1991). Beanie Babies are "creative, fictional" works that spring from the imagination of Ty's creative team. *Ty v. West Highland*, 1998 WL 698922 *14 (N.D. Ill. 1998). The second factor favors Ty.

3.     *Amount and substantiality of work used*

The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The amount of copied material considered in isolation does not suffice for a determination that the third factor favors the

plaintiff. I must instead focus my inquiry upon "whether the extent . . . of copying" goes farther than necessary to "further the purpose and character" of the purported use. *Campbell*, 510 U.S. at 586. In the instant case, this inquiry overlaps with the first fair use factor, which I have already determined in Ty's favor.

Having photographed about 140 Beanie Babies in each of its publications, PIL cannot argue that it made minimal use of Ty's work. Instead, PIL submits that as a "reviewer," it may fairly cite largely from an original work, "if his design uses the passages for the purposes of fair and reasonable criticism." (Def.'s Mem. at 6)(quoting *Folsom v. Marsh*, F.Cas. 342, 344 (C.C.D. Mass. 1841)).

In defense of its substantial appropriation of Ty's protected works, PIL argues that without photographs, it would be virtually impossible to describe and discuss Beanie Babies. Certain Beanie Babies are difficult to distinguish, PIL argues, and a collector's guide must contain photographs to capture and explain these distinctions. In particular, PIL gives six examples of toys that look different but share the same or similar names (for example, royal blue and light blue Peanut the elephant; Pinchers and Punchers the lobster).

In support of this argument, PIL seeks to introduce the report of a consumer survey by RL Associates entitled "Consumers' Perceptions of the Need for and Significant Features of Collector's Guides." (Giampietro Decl., Ex. 17). The survey of 243 individuals conducted at shopping malls across the country concludes that (1) collectors use guides as an important part of the collecting process, and (2) collectors believe that photographs are an essential feature of guides. Ty objects to the survey on the ground that it has been improperly authenticated. I decline to consider the survey for a different reason. It is immaterial. All it establishes is the unremarkable fact that collector's guides with pictures are more popular among the consuming

public than those without pictures. The fair use doctrine allows the use of copyrighted works in a reasonable manner for a limited purpose. It does not grant PIL the right to use as much copyrighted material as it needs to make its product commercially popular.

PIL might have written a book about Beanie Babies in which it employed drawings, limited numbers of photographs, or verbal descriptions to distinguish between similar toys. Instead, PIL's books contain color photographs of *every* item in Ty's Beanie Babies product line at the time of publication. These large color photographs feature Ty's products, viewed unobstructed, against a plain grey or white background.[3] In *For the Love of Beanie Babies,* Ty's products are photographed in fanciful group settings. Both the number of Beanie Babies found in PIL's books and their clear depiction in photographs are chief selling points, as PIL itself acknowledges in its advertising materials:

> "[O]ther guides show only sketches of each Beany Baby or cram several photos onto one page, but Beanie Babies Collector's Guide features beautiful full-color photography and displays each Beanie Baby on its page."

The copying in PIL's books goes much further than necessary to "further the purpose and character" of a work of commentary or criticism about Beanie Babies. *Campbell,* 510 U.S. at 586. The third fair use factor favors Ty.

4.       *Effect of the use on the potential market for or value of the copyrighted work*

---

[3] Conceding that its books contain photographs of Ty's copyrighted toys, PIL nonetheless protests that the "photos are of only one view of each three dimensional toy." I can only say that the copyright laws would offer precious little protection if they were construed only to prohibit unauthorized copying in the same medium. See 2 Nimmer on Copyright § 801[B] ("The fact that a work in one medium has been copied from a work in another medium does not render it any the less a 'copy.'"); *Rogers v. Koons,* 960 F.2d 301 (2nd Cir. 1992) (discussing the capacity of the copyright law to protect a photographer whose work was copied by a sculptor).

14

In connection with the fourth fair use factor, I must consider "the extent of market harm caused by the particular actions of the alleged infringer and [whether] unrestricted and widespread conduct of the sort engaged in by [defendant] . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. I must also consider harm to the market for derivative works, which is the market that "creators of original works would in general develop or license others to develop." *Id.* at 590, 592. To prevail on this fair use factor, Ty must only demonstrate that "if the unauthorized use becomes 'widespread,' it would prejudice his potential market for his work." *Harper & Row Publications, Inc. v. Nation Enterprises*, 471 U.S. 539, 568 (1985).

PIL says that its publications do not harm the original market for Beanie Babies, since "they are meant to accompany Ty's products, not replace them." If anything, PIL argues, its books encourage interest in Ty's plush collectibles. Even if this were true, it would not help PIL's case. See 3 Nimmer s 13.05[B](even though an infringing movie adaptation of a book may boost book sales, it is an unfair use because of the effect on the potential sale of adaptation rights); See *Paramount Pictures*, 11 F. Supp.2d at 334 (book about Star Trek interfered with plaintiff's market for derivative works such as guidebooks).

As to the question of harm to Ty's derivative works, PIL asserts that "[p]laintiff has introduced no evidence that Defendant's books compete directly with any products licensed by Ty." This is simply not true. Ty has demonstrated that it licenses at least six collector's guides all of which contain information similar both in content and format to that found in PIL's book. (See Pl.'s Mem. in Supp. of Summ. J., Ex G-J and N-S). *The Beanie Baby Handbook*, for example, like PIL's publications, is a one-Baby per page collector's guide with information about each toy's release date, estimated value, birth date, and a recommendation as to whether to

purchase. Moreover, PIL's infringing books are sold in the same locations in which Ty's licensees sell their products, including Barnes & Noble, Borders, and over the Internet.

Finally, Ty points out, PIL's own marketing materials invite the reader to compare PIL's *Beanie Babies Collector's Guide* to, among other things, the *Collector's Value Guide*, which is a book licensed by Ty. I find that PIL's guides are a "substitute for a derivative market" that Ty licenses others to develop. *Castle Rock Entertainment, Inc.,* 150 F.3d at 145. The fourth factor favors Ty.

   5.    *Aggregate Fair Use Assessment*

As described above, each of the four fair use factors weighs against PIL's claim of fair use. The copyright law's objective "[t]o promote the Progress of Science and useful Arts," U.S. Const. art. I, § 8, cl. 8, would be undermined by permitting PIL to produce and sell the books in question. I reject PIL's fair use defense.

**Other Defenses**

PIL's argument in support of its First Amendment defense on summary judgment is no different than the one I rejected in my opinion granting Ty's preliminary injunction. I remain unpersuaded for the reasons I articulated in that opinion. *Ty, Inc. v. Publications International, Ltd.*, 81 F.Supp.2d 899, 901-02 (N.D.Ill. 2000). See also *Twin Peaks Productions, Inc. v. Publications International, Ltd.*, 996 F.2d 1366, 1377 (2d Cir. 1993) (except in an extraordinary case, "the fair use doctrine encompasses all claims of first amendment in the copyright field."); *Castle Rock Entertainment*, 150 F.3d at 146 ("free speech . . . considerations are of little relevance" in a case involving "garden-variety infringement of creative fictional works.") As this court has held in a factually similar case, "[defendant] could have freely written about Ty's

Beanie Babies without infringing upon Ty's intellectual property rights." *Ty v. West Highland*, 1998 WL 698922 *18 (N.D.Ill. 1999)(Norgle, J.).

In its answer to Ty's complaint, PIL asserted other affirmative defenses including estoppel, the doctrine of first sale, and unfair competition and monopoly. To establish estoppel in a copyright action, the party to be estopped must be shown to have knowledge of defendant's infringing conduct and to have intended or actually induced such reliance. *Bourne Co. v. Hunter Country Club, Inc.*, 990 F.2d 934, 937 (7th Cir. 1993). Ty never authorized PIL to copy its protected works. Ty sent PIL a "cease and desist" letter immediately after it learned about PIL's infringement. Ty has aggressively prosecuted this case since its inception. PIL disputes none of this. There is no evidence on the record to support a defense of estoppel.

As to the defenses of first sale, unfair competition, and monopoly, PIL has waived them by failing to argue them. I therefore grant Ty's motion for summary judgment on its copyright claim.

## III. TRADEMARK INFRINGEMENT CLAIMS

Ty seeks summary judgment in its favor on its federal statutory and common law trademark infringement claims pursuant to § 1114(1)(a) and § 1125(a) of the Lanham Act. Ty argues that PIL's use of the registered mark "Beanie Babies" in the titles of its two collector's guides, as well as PIL's reproduction of Ty's trademarks and logos throughout its books infringes Ty's trademark rights.

In order to establish a prima facie case of registered trademark infringement, Ty must establish that it owns valid registered trademarks and that PIL's use of these trademarks is "likely to cause confusion, or to cause mistake, or to deceive . . ." 15 U.S.C. § 1114(1)(a). Similarly, to

prevail on its common law trademark infringement claim and its false designation of origin or unfair competition claims under Section 43(a) of the Lanham Act, Ty must establish that it has a protectable trademark and that a likelihood of confusion exists. Customer confusion need not be restricted to confusion over the source of the goods. I must also consider whether a customer buying one of PIL's books would likely believe that it is "in some way related to, or connected or affiliated with, or sponsored by" the Plaintiff Ty. *Nike, Inc. v. "Just Did It" Enterprises,* 6 F.3d 1225, 1228 (7th Cir. 1993).

### *Ownership of Registered Trademark*

Turning to the first statutory factor, I find that there is no dispute regarding Ty's ownership of its registered trademarks. Ty has presented me with trademark registrations for the marks: Beanie Babies®, The Beanie Babies Collection®, Ty ®, and the Ty Heart® logo. These registrations are "prima facie evidence of the validity of the registered mark and of the registration of the mark." 15 U.S.C. § 1115(a). Ty satisfies the first prong of the trademark liability test.

### *Likelihood of Confusion*

When assessing likelihood for consumer confusion, this circuit looks to seven factors: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion (7) intent of defendant to "palm off his product as that of another." *AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 615 (7th Cir. 1993); *McGraw-Edison Co. v. Walt Disney Productions,* 787 F.2d 1163, 1167-68 (7th Cir. 1986).

The list of factors is not exclusive, nor does any one factor end the inquiry.

*McGraw-Edison Co.*, 787 F.2d at 1168. Here, PIL is not required to refute each and every factor to avoid summary judgment for the plaintiff. Rather, the weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other. *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1187 (7th Cir.1989).

When I had occasion to examine the likelihood of confusion factors in the context of Ty's motion for a preliminary injunction, I considered that there was "a substantial likelihood of confusion" as to the source or sponsorship of PIL's books. At that stage in the proceedings, I had only to determine whether Ty's chances of demonstrating likelihood of confusion were "better than negligible." *Meridian Mutual Insurance Co. v. Meridian Insurance Group, Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997). My analysis of the likelihood of confusion factors at the preliminary injunction stage does not bind me with respect to Ty's motion for summary judgment. *Ayres v. City of Chicago*, 125 F.3d 1010, 1013 (7th Cir. 1997)([f]indings supporting the issuance of a preliminary injunction are not binding upon the merits of the case and are not the law of the case). Ty's burden of proof on the likelihood of confusion prong is much higher here.

I also note that as a general rule, "a motion for summary judgment in trademark infringement cases must be approached with great caution." *AHP Subsidiary Holding Co.,* 1 F.3d at 616 (7th Cir. 1993)(reversing grant of summary judgment for defendant where issues of fact existed regarding likelihood of consumer confusion); *Nike, Inc. v. "Just Did It" Enterprises,* 6 F.3d 1225, 1230 (7th Cir. 1993)(reversing grant of summary judgment for plaintiff where too many disputed facts required a trial for resolution). This is because the likelihood of consumer confusion is "a question of fact and can only rarely be resolved on a Motion for Summary

Judgment." *Midway Manufacturing Co. v. PIL*, 1994 WL 188531 *2 (N.D. Ill. 1994); *Ty v. West Highland*, *16 (the determination as to whether there is a likelihood of confusion is intensely fact-based).

1.      *Similarity of marks in appearance and suggestion*

The registered trademark "Beanie Babies" is incorporated in the title and used on the cover of each of PIL's books.  In addition, PIL's books include photographs of Beanie Babies wearing the Ty Heart logo.  In determining whether PIL's use of Ty's marks causes confusion, I must consider PIL's use "in light of what happens in the marketplace," among those who buy or consider buying PIL's books.  *Meridian Mutual Insurance Co.*, 128 F.3d at 1115.

Ty argues that courts that have consistently ruled that the use of trademarks in book titles supports a claim for trademark infringement.[4]  I think that the issue of whether a trademarked phrase can be incorporated into the title of a book is not quite as simple as Ty describes it.  Using a trademarked name in a book title is not a per se violation of the Lanham Act.  *Twin Peaks Productions, Inc.*, 996 F.2d at 1379.  Literary titles, for example, do not violate the Lanham Act "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." *Id.* at 1379 (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989)).  In determining whether use of a trademarked name in a book title violates the Lanham Act, courts must give special consideration to the "wording and appearance" of the title on the book's cover.  *Id.*  A

---

[4] Ty cites the following cases to that effect: *Selchow & Righer Co. v. McGraw-Hill Book Co.*, 580 F.2d 25, 28 (2nd Cir. 1978)(upholding grant of preliminary injunction where defendant used plaintiff's SCRABBLE trademark in the title of its book); *Toho Co. Ltd. v. William Morrow and Co., Inc.*, 33 F. Supp.2d 1206 (C.D. Cal. 1998)(preliminary injunction granted where publisher used plaintiff's trademark "Godzilla" in the title of his book); *Horn Abbot Ltd. v. Sarsaparilla Ltd.*, 601 F. Supp. 360, 365 (N.D.Ill. 1984)(temporary injunctive relief granted where defendant published unauthorized supplement to board game entitled "In Further Pursuit of Trivial Pursuit").

book title is more likely to violate the Lanham Act "when displayed in a manner that conjures up a visual image prominently associated with the work bearing the mark that was copied." *Id.* at 1380.

In the instant case, the words "Beanie Babies" on the cover of *The Beanie Babies Collector's Guide* are prominently displayed on the cover. The words appear in red, orange, and purple coloring and in a large type size. Ty's marks are similarly prominently displayed on the cover of *For the Love of Beanie Babies*. Unlike the cases that Ty cited, however, the protected mark, "Beanie Babies," does not appear in distinctive lettering, or against a background or design that a consumer would understand as emanating from the source of the makers of Beanie Babies. *Cf. Horn Abbot Ltd.,* 60 F. Supp. at 365 (TRO granted where defendant publisher of "supplement" to Trivial Pursuit board game mimicked plaintiff's distinctive blue background color and orange lettering on the cover of the infringing book); *Toho Co., Ltd. v. Morrow and Co.*, 33 F. Supp.2d 1206, 1209 (C.D. Cal. 1998) (preliminary injunction granted where the title of the infringing book was "written in the distinctive lettering style used by [Plaintiff] and its licensees in their merchandising activities.") It is significant for the likelihood of confusion analysis that PIL has not displayed Ty's trademarks in a manner that conjures up a visual image prominently associated with Ty's works.

PIL urges me to consider the fact that its books all contain marks identifying itself as the source of the product. PIL put one of its own trademarks (either Favorite Brand Name™ or Collector's Guide™) in a prominent location on the front cover of each edition of *The Beanie Babies Collector's Guide*. One version of this publication states that it is "by the authors of Collector's Guide." At least with respect to *The Beanie Babies Collector's Guide*, PIL's use of its own marks is a point in its favor. See *Pirone v. Macmillan, Inc.*, 894 F.2d 579, 584 (2d Cir.

21

1990)(use of Babe Ruth's name and likeness on defendant's baseball calendar did not cause likelihood of confusion "where the source of the publication is clearly indicated by the numerous prominent references to [defendant].")

PIL also asserts that all of the books in question have disclaimers on the front covers and first page, stating that the book "is not authorized or licensed by Ty, Inc." and that PIL "is not affiliated with Ty, Inc." While courts are not always convinced that a defendant's use of a disclaimer decreases the likelihood of confusion, *Horn Abbot Ltd.*, 60 F.Supp. at 366, I must consider the statutory factors in light of the specific circumstances presented in this case.

The instant case involves a trademark owner whose products have achieved a unique status among many members of the public. There is a thriving market for second-hand Beanie Babies. Many participants in this market buy and sell Ty's products in non-traditional arenas such as at yard sales, through collectors' clubs, and over the Internet.[5] Of course, it would be unreasonable to deny trademark protection to a manufacturer just because it had the "good fortune to have created a trade name . . . that became valued by the consuming public." *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 340 (7th Cir. 1985). The fact remains, however, that in the specific context of the market for Beanie Babies, a consumer may be less likely to think that any one publication about Beanie Babies emanates from, or is endorsed by Ty. A disclaimer may have more effect in these particular circumstances.

I also note that when courts have refused to consider disclaimers in the context of trademark disputes, it is frequently because they are unimpressed with the size or location of the

---

[5] Ty objects to PIL's submission of thousands of pages of internet printouts demonstrating the existence of numerous unlicensed websites featuring Ty's Beanie Babies. Ty urges me not to consider these print outs because they are inadmissible hearsay. I need not reach this question. Ty's own submissions, including nearly 100 newspaper and magazine articles as well as the deposition testimony of its employees, is more than sufficient to demonstrate the existence of numerous websites (licensed and unlicensed) devoted to Ty's products.

disclaimer on the infringing product. See *Horn Abbot Ltd.*, 601 F.Supp. at 366 ("given the [disclaimer's] small print and the otherwise strong similarity between the two products, the consumer is still likely to be confused or deceived"); *Toho Co., Ltd. v. Morrow and Co.*, 33 F. Supp.2d 1206, 1214 (C.D. Cal. 1998)(placement of the word "unauthorized" in small lettering at the extreme top edge of the front cover would not alert consumers as to product's source). Here, PIL's disclaimer appears on the front cover of each book; in *The Beanie Babies Collector's Guide*, it appears in bold lettering. In the specific context of this case, there is a question of fact as to whether PIL's use of disclaimers and its own brand names obviates a likelihood of confusion.

2.      *Similarity of the product*

Ty has licensed other publishers to publish and sell magazines and books similar to PIL's books. Such licensed publications, including *Collector's Value Guide for Beanie Babies*, are similar in format and content to PIL's publications. Trademark law prohibits the use of Ty's mark on products that are closely related to Ty's works, as well as those products in direct competition. *Sands, Taylor, & Wood, Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir. 1992). This factor favors Ty.

3.      *Area and manner of concurrent use*

The concurrent use factor focuses on the overlap of promotion, distribution, and sales of the parties' goods. PIL's books were sold at bookstores such as Borders, Barnes & Noble, and over the Internet. Ty's licensees sell their books and magazines at the same outlets. This factor also favors Ty.

23

## 4. Degree of care likely to be exercised by consumers

The less care consumers take in purchasing a product, the greater the likelihood that similar marks will confuse customers to the source or sponsorship of the product. *Toho Co., Ltd. v. Morrow and Co.*, 33 F. Supp.2d 1206, 1214 (C.D. Cal. 1998). Relying on *AHP Subsidiary Holding Co. v. Stuart Hale, Co.*, 1 F.3d 611, 616 (7th Cir. 1993), Ty argues that consumers of Beanie Baby guides are likely to exercise little care when purchasing PIL's products because of their low cost. I note that this is contrary to a representation Ty made in another trademark case. *Imperial Toy Corp., v. Ty, Inc.*, 1998 WL 601875 at *4 (N.D.Ill. 1998)("Ty, Inc. argues that . . . Beanie Baby customers are sophisticated about the product and will not be confused and will exercise care when purchasing . . .").

I tend to agree with Ty's previous characterization of its consumers. People who buy PIL's collector's books probably already know something about Beanie Babies. It is quite likely that they will have heard of Ty. After all, collectors of Beanie Babies are, by definition, brand conscious. It is part of their role as collectors to be constantly concerned with the authenticity of their plush toys and identifying tags. People who buy PIL's books may well notice the absence of the famous Ty Heart logo on the cover. Just as Beanie Baby collectors exercise care with respect to Ty's plush animals, there is some reason to believe that they will also exercise care as to their choice of collector's guides. I find that this factor weighs slightly in favor of PIL.

## 5. Strength of plaintiff's mark

The term "strength" as applied to trademarks refers to "the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular source." *Sands, Taylor & Wood Co.*, 978 F.2d at 959. The Ty Heart Logo has been used on over 200 different characters in connection with the sale of more than one billion plush

toys since 1993. Hundreds of magazines and newspaper articles have reported on the "Beanie Babies" phenomenon. Beanie Babies received national recognition in connection with McDonalds promotions where over 300 million miniature Beanie Babies were distributed in Happy Meals from 1997 to 2000. Ty's marks are undeniably strong.

6. *Actual confusion*

Ty concedes that it cannot show evidence of an actual instance in which a consumer mistakenly believed that PIL's book was sponsored or endorsed by Ty. (Jeremias Deposition at 53; Rogers Deposition at 72). While this is a point in PIL's favor, I am mindful that Ty need not show actual confusion to establish "likelihood of confusion" under the Lanham Act. *AHP Subsidiary Holding,* 1 F.3d at 618; *Sands, Taylor & Wood Co.,* 978 F.2d at 960.

7. *Intent*

In the trademark infringement context, "'intent' refers to the intent to confuse customers, not merely the intent to use a mark that is already in use somewhere else." *Meridian Mutual Insurance Co.,* 128 F.3d at 1119. I am not convinced that PIL intended to "palm off" its books as Ty's products or products endorsed by Ty.

The instant case is distinguishable from the garden-variety trademark infringement case in which a defendant is clearly using a plaintiff's marks in a deceitful way. Consider, for example, *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22 (1st Cir. 1989). In that case, a defendant printed a T-shirt with the words "Boston Marathon," and sold them at the event, permitting the impression that his shirts were officially sponsored by the Boston Marathon. The court found the intent element satisfied since the use of plaintiff's trademark carried with it an "unmistakable aura of deception." *Id.* at 35. Similarly, in *Chrysler Corp. v. Newfield Publications, Inc.,* 880 F. Supp. 504 (E.D.Mich. 1995), a publisher's infringing collectible cards depicting Chrysler's

automobiles satisfied the intent element in part because the cards contained a misleading caption reading: "photograph: courtesy of Chrysler." Ty's allegations as to PIL's intent do not reach the same level of deceitfulness. While PIL could have and should have taken more care to prevent the possibility of consumer confusion, I do not think that Ty's books carry with them an "unmistakable aura of deception."

In connection with the intent factor, I must also consider the deposition testimony of PIL's CEO, Louis Weber. Mr. Weber testified that before publishing his books he sought legal advice. He stated that outside counsel assured him that PIL's proposed publications would not violate Ty's intellectual property rights. While registering my skepticism about whether PIL's reliance on counsel's opinions was reasonable, I find that summary judgment is not the appropriate time to make final determinations as to credibility. *AHP Subsidiary Holding,* 1 F.3d at 618 (citing *Wilson v. Williams,* 997 F.2d 348, 350 (7th Cir. 1993). There are questions of fact as to PIL's intent.

8.    *Other (non-statutory) factors*

I accord no weight to PIL's argument that plaintiff has forfeited its trademark rights by failing to police its trademarks. PIL's assertion that Ty allows "use of its trademarks by virtually everyone and anyone who wishes to do so" is frivolous. One has only to count the number of times that Ty has appeared before this court as plaintiff in copyright and trademark suits to know that Ty puts a great deal of effort into policing its intellectual property rights. In any event, evidence of other potential infringers is irrelevant to a suit against a particular infringer. *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1181 (9th Cir. 1985).

## 9. *Summary of likelihood of confusion analysis*

Sections 1114(1)(a) and 1125(a) of the Lanham Act confer a limited right to trademark owners; this is the right to prevent others from using its marks in a way that causes consumer confusion about the owner's sponsorship or endorsement of a product. *WCVB-TV v. Boston Athletic Association*, 926 F.2d 42, 45 (1st Cir. 1991). The issue at hand is not whether PIL used Ty's trademarks frequently, or whether it used them more than a company exercising sound professional and ethical judgment would have done. The sole issue to consider is whether consumers are likely to be confused about the source or sponsorship of PIL's books.

This is a very close case. Ultimately, however, I think that Ty has demonstrated a "possibility" of confusion rather than a "likelihood" of confusion. This is not enough. *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663 (5th Cir. 2000)("[l]ikelihood of confusion is synonymous with a probability of confusion, not possibility of confusion"). Given the questions of fact that remain about PIL's use of disclaimers and its own identifying marks, the degree of consumer care exercised in purchasing its books, and PIL's intent, I simply do not believe that Ty has presented me with sufficient evidence of likelihood of confusion to enter summary judgment on its behalf. Because a motion for summary judgment in a trademark infringement case must be approached with great caution, *AHP Subsidiary Holding Co. v. Stuart Hale, Co.*, 1 F.3d 611, 616 (7th Cir. 1993), I will not decide the likelihood of confusion analysis against PIL at this stage. I deny Ty's motion for summary judgment on its trademark infringement claims.

## IV. DAMAGES

Since Ty has prevailed on its copyright claims, I must now consider the question of damages. I find that the damages question cannot be resolved without determining whether PIL's conduct in producing and selling its books should be considered willful or intentional copyright infringement.[6] The question of intent involves determinations of credibility which are best made after a full evidentiary hearing.

In addition to actual and statutory damages, Ty seeks (1) PIL's sales and revenues from the infringing products, (2) costs, (3) punitive damages, and (4) attorneys' fees. There is also the dilemma of what to do with any infringing books that remain in stock. At present, I have no information as to how many infringing books are still in PIL's possession. I order PIL to supply this information in their brief. I note that in the past Ty has entered into settlement agreements in which infringers sold off their remaining stock, apportioning part of the profits to Ty. If substantial stock remains, the parties should consider this approach.

I withhold judgment on the issue of damages, pending briefing of these issues. I ask that the parties pay particular attention to the question of PIL's "reasonable reliance" on the advice of counsel in defense of Ty's allegation of willful infringement. I invite the parties to submit briefs on the issue of damages by November 15, 2000. I will schedule a date for an evidentiary hearing when the parties come before me on October 12, 2000.

---

[6] Absent a finding of willful infringement, statutory damages for the violation of Ty's copyright rights may range from $750 to $30,000; if PIL's actions were willful, the statutory maximum is $150,000. 17 U.S.C. § 504(c)(2).

## V. CONCLUSION

Plaintiff's motion for summary judgment on its copyright claim is granted on the issue of liability alone. Plaintiff's motion for summary judgment on its trademark infringement claims is denied. I withhold decision on the issue of damages, pending briefing.

ENTER:

James B. Zagel
United States District Judge

DATE: OCT - 4 2000