# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5565 | **DATE** | 7/27/2004 |
| **CASE TITLE** | TY, INC. vs. PUBLICATIONS INTERNATIONAL, LTD. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiff's motion (224-1) for summary judgment regarding *For the Love of Beanie Babies* is granted, but defendant's motion for summary judgment on its Affirmative Defense of Copyright Fair Use is denied. Enter memorandum opinion and order.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| ✓ | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

AUG 05 2004
date docketed

docketing deputy initials

date mailed notice

Document Number

241

DW

courtroom deputy's initials

U.S. DISTRICT COURT
CLERK
2004 AUG -4 PM 3:21

Date/time received in central Clerk's Office

mailing deputy initials

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| TY, INC., | |
| Plaintiff, | |
| v. | No. 99 C 5565 |
| | Judge James B. Zagel |
| PUBLICATIONS INTERNATIONAL, LTD., | |
| Defendant. | |



## MEMORANDUM OPINION AND ORDER

In an order dated October 4, 2000, I granted Plaintiff Ty, Inc.'s motion for summary

judgment on its copyright claim in connection with Publications International, Ltd.'s ("PIL")

books about Beanie Baby toys *For the Love of Beanie Babies* and *Beanie Babies Collectors*

*Guides*. *Ty, Inc. v. Publications Int'l Ltd.*, 2000 U.S. Dist. LEXIS 15382 (N.D. Ill. Oct. 4, 2000).

PIL appealed, and the Seventh Circuit reversed. *Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512

(7th Cir. 2002). According to the Seventh Circuit, "[t]he proper characterization of PIL's Beanie

Baby books is the kind of fact-laden issue appropriate for summary judgment only in extreme

cases, which this case is not – in part because of differences among the books that the district

court found infringed Ty's copyright." *Id.* at 519. Nevertheless, the Court of Appeals suggested

that summary judgment might be appropriate in connection with *For the Love of Beanie Babies*:

> [W]hile summary judgment is plainly not warranted with regard to all the books that the
> district court found infringed Ty's copyrights, it might be warranted with regard to some
> of them, specifically *For the Love of Beanie Babies*. . . . We do not preclude
> consideration on remand of the possibility of partial summary judgment.

241

*Id.* at 523. Ty now moves for partial summary judgment in connection with all three versions of the book *For the Love of Beanie Babies*, and PIL moves for complete summary judgment in connection with all books at issue here.

Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment in its favor "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." In this case, the only remaining liability issue is whether PIL's use of Ty's copyrighted material constitutes fair use.[1] Where the facts are undisputed, I may rule as a matter of law on the issue of copyright fair use. *See Stewart v. Abend*, 495 U.S. 207, 238 (1990) (summary judgment for plaintiffs on copyright infringement claim and on issue of fair use); *Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992) (affirming granting of summary judgment for plaintiff on copyright infringement claim and rejecting fair use defense as matter of law). Here, I will first address Ty's motion, and then address PIL's.

---

[1] In order to prove its copyright infringement claim, Ty must demonstrate that (1) it owns valid copyrights, and (2) PIL copied the protected works. *Wildlife Express Corp. v. Carol Wright Sales*, 18 F.3d 502 (7th Cir. 1994). In my first summary judgment ruling, I concluded that Ty proved the elements of ownership and copying, and hence "established a prima facie case of copyright infringement." *Ty, Inc.*, 2000 U.S. Dist. LEXIS 15382, at **13-14. Because PIL did not challenge this finding on appeal, this is the law of the case. *Schering Corp. v. Illinois Antibiotics Co.*, 89 F.3d 357, 358 (7th Cir. 1996) ("Under the doctrine of the law of the case, a ruling by the trial court, in an earlier stage of the case, that could have been but was not challenged on appeal is binding in subsequent stages of the case.").

## Background

In August of 1998, PIL began publishing a selling a book entitled *For the Love of Beanie Babies.* This hardcover picture book displays color photographs of Ty's Beanie Babies toys. PIL published three versions of *For the Love of Beanie Babies* under four different PIL item numbers and three different International Standard Book Numbers ("ISBNs"), as follows:

| Title | PIL Item No. | ISBN |
|---|---|---|
| 1. *For the Love of Beanie Babies* (Jacketed) | 4028000 | 0-7853-3224-3 |
|    *For the Love of Beanie Babies* (Without Jacket) | 4028001[2] | |
|    **(Hereafter "Version 1")** | | |
| | | |
| 2. *For the Love of Beanie Babies, A Collectors Guide* | 4028007 | 0-7853-3604-4 |
|    **(Hereafter "Version 2")** | | |
| | | |
| 3. *For the Love of Beanie Babies, A Collectors Guide* | 4029900 | 0-7853-3987-6 |
|    (Updated and Revised) | | |
|    **(Hereafter "Version 3")** | | |

PIL's sales of the three versions of *For the Love of Beanie Babies* were as follows:

| Version | Units Sold | Dollar Sales |
|---|---|---|
| Version 1 (Jacketed) | 35,857 | $120,069 |
| Version 1 (Without Jacket) | 72,626 | $225,794 |
| Version 2 | 11,102 | $14,533 |
| Version 3 | 163,049 | $340,299 |
| Totals | 282,634 | $700,695 |

During his deposition, Mr. Louis Weber, CEO of PIL, was asked if PIL was selling and distributing Beanie Baby books to make a profit, and he responded, "Absolutely."

---

[2] Other than the fact that PIL Item No. 4028000 had a dust jacket and PIL Item No. 4028001 did not, the two books are identical.

All three versions of *For the Love of Beanie Babies* contain color photographs of nearly every item in Ty's Beanie Babies plush toy line that was in existence at the time the books were prepared, which amounts to 157 different Beanie Babies toys in Version 1, 157 different Beanie Babies toys in Version 2, and 196 different Beanie Babies toys in Version 3. In Versions 1 and 2, each toy appears multiple times, and in Version 3 several toys are pictured more than once.

The photographs of Ty's Beanie Babies toys in these books can be divided into four general categories: (1) photographs on the covers; (2) full-page group shots in fanciful settings; (3) "filler" photographs; and (4) individual photographs next to a write-up on each toy, as explained below.

**(1) Cover Photographs**. Color photographs of nine different Beanie Babies toys are on the front cover of all 3 versions of *For the Love of Beanie Babies*, and color photographs of two additional Beanie Babies toys are on the back covers of each version of the book. (See Exs A-C).

**(2) Full-Page Group Shots**. Versions 1 and 2 of *For the Love of Beanie Babies* divide the Beanie Babies toys into 13 categories (such as "Garden Variety," "Life in the Sea," and "Forest Friends"), and the introduction to each category contains a color photograph covering one full page, depicting Ty's Beanie Babies in fanciful, decorative settings, and also features a photograph of a single Beanie Baby on the opposite page. The photographs have accompanying text that describes the scene. (See Exs. A and B).

**(3) Filler Photographs**. Versions 1 and 2 of *For the Love of Beanie Babies* also contain photographs and Beanie Babies toys on the Title Page and the Table of Contents. (See Ex. A and B).

**(4) Photographs of Individual Toys.** Finally, Versions 1 and 2 of *For the Love of Beanie Babies* have individual toy photographs with accompanying commentary listed according to category, and Version 3 has individual toy photographs with accompanying commentary listed alphabetically. Versions 1 and 2 also have photographs of the new releases at the end of the books, with little or no commentary.

In planning the production of *For the Love of Beanie Babies*, PIL wrote to Denise O'Neal, the contributing writer of Version 1, and described the book as a "full-color photo book featuring short write-ups on each of the Beanie Babies." PIL asked O'Neal to "rewrite approximately 15,600 words from the *Beanie Babies Collectors Guide* [another type of publication at issue in this case][3] to make it more suited to the concept of *For the Love of Beanie Babies*. She was further told, "[r]eferences to price and value should be deleted, and emphasis should be placed on appearance, interesting facts, and trivia."[4] In another PIL document sent to O'Neal setting forth the "Write Guidelines" for the book, *For the Love of Beanie Babies* was referred to as an "upsize Beanie appreciation book," and the guidelines further stated:

> references to price and value should be deleted, and emphasis should be placed on appearance, interesting facts, and trivia, and "love" of Beanie Babies. Avoid mentioning

---

[3] Incidentally, PIL criticizes Ty for failing to analyze PIL's *Beanie Babies Collectors' guide* books, and for not simultaneously moving for summary judgment as to those books, presumably on the basis that the books are very similar and that if summary judgment is urged for one, it should be urged for the other. Nonetheless, as movant, Ty can move for partial summary judgment on any material issue in this case that it wants, regardless of whether it may prevail on other issues outside of the scope of the present motion.

[4] Of course, as PIL points out, this was not done and *For the Love of Beanie Babies* did incorporate some references to price and value.

the secondary market – this is not a buying guide.[5] . . . Also attached are sample writings for five Beanies. These are <u>exactly</u> the tone and style I am looking for; light, friendly, and descriptive, full of puns and appreciative for the Beanies, yet still imparting some important information about tags, errors, promotions, releases, etc. . . . You will need to delete all "technical" info, such as style number, value, birthdate, tag poem, and so on.[6]

On the back covers of all three versions of the book, PIL uses the photographs of the Beanie Babies toys as selling points. In Version 1 the back cover refers to the book as a "Beanie Family Album" and states that "Every Beanie Baby is showcased here with its own full-color photograph, detailed description, and fun facts for the Beanie enthusiast to enjoy." The inside of the back flap of Version 1's dust jacket further reads: "For the Love of Beanie Babies features gorgeous photographs of these plush animals in their 'natural' habitats. Each Beanie Baby is also showcased individually with a full-color photo, a lively description, and fun facts about what makes the animal so collectible." The back cover of Version 2 also touts the photographs in the book: "Featuring gorgeous photography of the Beanie Babies in the 'natural' habitats, this guide profiles every current and retired Beanie Baby and showcases each one individually with a full-color photo, a lively description, and fun facts." Finally, the back cover of Version 3 states, "[t]his guide profiles every current and retired Beanie Baby, showcasing each one individually with a full-color photo, and in-depth description, and fun facts."

During the time that PIL was selling *For the Love of Beanie Babies* and thereafter, Ty entered into license agreements with at least seven publishers to publish books and magazines about Beanie Baby toys. Ty collected over $2.65 million in royalties and settlement amounts

---

[5] Once again, as PIL points out, this was not done and *For the Love of Beanie Babies* did incorporate some references to the secondary market.

[6] Once again, as PIL points out, this was not entirely done and *For the Love of Beanie Babies* did incorporate some references to "technical" information.

from these licensees. One licensee alone (Checkerbee Publishing, a.k.a. Collector's Publishing Co., Inc.) paid Ty over $1.2 million in royalties and settlement amounts, and complained to Ty about PIL's books (including *For the Love of Beanie Babies*), because it had to compete against PIL, which could sell its Beanie Baby books for a "substantially reduced price" because it was not paying Ty a royalty. *For the Love of Beanie Babies* books were sold in similar bookstores and outlets as Ty's licensed books and magazines about Beanie Baby toys.

Fair Use

The copyright fair use defense is found in Section 107 of the Copyright Act, 17 U.S.C. § 107, which reads in relevant part"

> [T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include –
> (1)   the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2)   the nature of the copyrighted work;
> (3)   the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4)   the effect of the use upon the potential market for or value of the copyrighted work.

1. Purpose and Character of Use

The first fair use factor is the "purpose and character of the [allegedly infringing] use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Under this factor, there are two separate inquiries to be conducted: (1)

whether the work is primarily commercial in nature, or whether it aspires to serve broader public

purposes; and (2) whether PIL's book is "transformative," in that it "adds something new, with a

further purpose or different character, altering the [protected work] with new expression,

meaning, or message." *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 579 (1994).


### A. Commercial/Noncommercial Aspect

Here, all three versions of *For the Love of Beanie Babies* are primarily commercial in

nature. PIL is a publishing business, sold the books to make money, and did indeed make

money. These facts weigh against fair use under the commercial/noncommercial inquiry of the

first factor. *See Stewart*, 495 U.S. at 237 (upholding lower court's finding that first factor

weighed against a finding of fair use where the defendant received $12 million from its

infringing activities).

In additional, PIL used the infringing photographs to promote all three versions of the

book, by not only displaying infringing photographs on the covers of the books themselves, but

also by referencing the "group shots" and the individual photographs as enticements for

consumers to purchase the books. This also weighs against fair use. *See Campbell*, 510 U.S. at

585 ("The use, for example, of a copyrighted work to advertise a product, even in a parody, will

be entitled to less indulgence under the first factor of the fair use enquiry than the sale of a

parody for its own sake."); *Publications Int'l Ltd. v. Bally Mfg. Corp.*, 215 U.S.P.Q. 861, 862

(N.D. Ill. 1982) (PIL's use of copyrighted images on front and back covers of book about Pac

Man video game were not entitled to fair use protection where the "sole purpose" of the

copyrighted illustrations was to assist sales); *Rubin v. Brooks/Cole Publ'g Co.*, 836 F. Supp. 909,

8

917 (D. Mass. 1993) ("Whether the inclusion of copied material was made evident to prospective purchasers has been held relevant when considering whether the alleged infringer profited from use of the copied material.").

Along these same lines, *For the Love of Beanie Babies* does not primarily serve a "broader public purpose" such as criticism, commentary or scholarship because it is evident that the primary "purpose" of this book is not to provide criticism or commentary on Beanie Babies toys. An equally important, if not more important purpose, is to present an aesthetically-pleasing and decorative collection of photographs of Beanie Babies for enthusiasts to enjoy (*i.e.*, to provide an additional outlet for their "love" of Beanie Babies). PIL itself identified *For the Love of Beanie Babies* as a "full-color photo book," an "upsize Beanie appreciation book," and specifically instructed the writer of the text of Version 1 to delete "technical" information such as style number, value, birthdate, tag poem, and so on, stating, "this is not a buying guide." The back cover of Version 1 further characterizes the book as a "Beanie family album." Furthermore, the Seventh Circuit concluded that "*For the Love of Beanie Babies* might well be thought essentially just a collection of photographs of Beanie Babies, and photographs of Beanie Babies are derivative works from the copyrighted Beanie Babies themselves." *Ty, Inc.*, 292 F.3d at 519. This is especially true in connection with Version 1, where the Seventh Circuit noted that commentary in connection with the full-page spread was "childish" and "pretty clearly secondary to" the more than full-page photographs.[7] The Court also noted that some of the commentary

---

[7] In addition to the feline example used by the Seventh Circuit, the commentary accompanying the "Life in the Sea" full-page spread from Version 1 bears this out:
> What a wet and wild bunch! These Beanie Babies make waves in the underwater playground. Sting the stingray, Inky the octopus, Claude the crab, and Pinchers the lobster creep along the sandy ocean floor, while Bubbles, Coral and Goldie the fish (top

accompanying the individual photographs "seems distinctly secondary to the photograph." 292

F.3d at 519.[8] The fact that *For the Love of Beanie Babies* does not serve a "broader public

purpose" such as criticism, commentary or scholarship additionally weighs against fair use. *See*

*Stewart*, 498 U.S. at 237 (upholding lower court's finding that the first factor weighed against a

finding of fair use where the defendant's re-release of the motion picture "Rear Window" did not

fall into any of the categories listed in the introduction of § 107); *Publications Int'l v. Bally*, 215

U.S.P.Q. at 861 (PIL's use of Bally's copyrighted Pac Man images on the over and filler pages of

the books in question was not fair use where such use "has no instructional value" whatsoever).

It is also relevant under the first prong of the first fair use factor that PIL used the

photographs of Ty's copyrighted toys without "paying the customary price." It is undisputed that

Ty had licensed several publishers to publish books and magazines similar to *For the Love of*

*Beanie Babies*; these licensees paid significant royalties to Ty; and PIL published its books

without paying anything to Ty. Such facts also weigh against finding fair use. *Harper & Row,*

*Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985) ("The crux of the profit/nonprofit

---

to bottom) glide through the watery world. Crunch the shark keeps a watchful eye on the
aquatic action, and (from left) Waves the whale, Seaweed the otter, Manny the manatee,
and Echo the dolphin romp playfully near the surface.
This childish, frivolous tone is used with every full-page spread in Version 1.

[8] This is also illustrated by the text next to "Ears" the brown rabbit:
It's easy to see where this silly wabbit got his name. Ears is a velvety, dark brown hare
with huge, soft ears lined in white, a white puff tail, and a pink nose and whiskers. The
oldest of the bunnies in Ty's line, Ears, lying flopped down on his belly, looks like he's
eaten one too many carrots. This cabbage-patch dweller said "so long" on May 1, 1998.
Retired.

This tone is used in connection with all of the individual photographs in Version 1.

distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.").

For the foregoing reasons, the commercial/noncommercial aspect of the first fair use factor weighs against a finding of fair use in connection with all categories of photographs in the books, including the covers, full-page group shots, filler photographs and individual photographs, because these photographs are "primarily commercial in nature." *Campbell*, 510 U.S. at 579-85.

## B. *Transformative Nature*

The second inquiry under the first fair use factor is whether PIL's use of Ty's copyrighted material is transformative. As the Supreme Court described:

> The central purpose of [the] investigation is to see, in Justice Story's words, whether the new work merely "supersede[s] the objects" of the original creation, ("supplanting" the original), or instead adds something new, with a further purpose or different character, altering the first with new express, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative."

*Campbell*, 510 U.S. at 579. Courts have fashioned various formulas to determine whether a given use is transformative, and the application to the instant facts indicates no transformative use here.

Under one formula, the inquiry is whether the new work "supercedes the objects" of the original creation. *Id; see also Elvis Presley Enters. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) ("Courts have described new works as 'transformative' when the works use copyrighted material for purposes distinct from the purpose of the original material."). In other words, a work is not considered transformative if it serves the same purpose as plaintiff's original or derivative works. *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 199 (3d Cir. 2003), *cert. den.*, 124 S.Ct. 1410 (2004) ("it is highly relevant to our inquiry here that the

[infringing] clips will likely serve as substitutes for" plaintiff's derivative works). Here, PIL uses photographs of Ty's copyrighted toys for the same purposes as Ty's original toys and their derivative photographs in licensed books and magazines. Ty's Beanie Babies are considered "soft sculptures." Consequently, the toys themselves, as well as the glossy, color photographs of the toys in licensed books and magazines, serve an aesthetic, decorative purpose – to be viewed and enjoyed as works of visual art. This is the same purpose primarily served by the photographs of these toys in all four categories and in all three versions of PIL's *For the Love of Beanie Babies*. The fact that photographs appear on the covers, in full-page spreads, in filler pages, and in large, glossy individual photographs that are the main focal points of each page demonstrates that the photographs primarily serve an aesthetic, decorative purpose in PIL's books. Because the purposes are the same, there is no transformative use, and hence no fair use under the second prong of the first fair use factor. *See Elvis Presley Enters.*, 349 F.3d at 629 (finding no transformative use where "many of the film clips seem to be used in excess of [the purpose of telling part of the story of Elvis Presley's life], and instead are simply rebroadcast for entertainment purposes that Plaintiffs rightfully own. This comes as no surprise to the viewer since The Definitive Elvis advertises as much on its external packaging."); *Davis v. Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001) (no transformative use where defendant used copyrighted eyewear "as eye jewelry in the manner it was made to be worn"); *Castle Rock Entm't v. Carol Publ'g Group*, 150 F.3d 132, 142 (2d Cir. 1998) (no transformative use where purpose of defendant's book "is to repackage Seinfeld to entertain Seinfeld viewers."); *Video Pipeline*, 342 F.3d at 198-99 (no transformative use where defendant's film clips were "likely to 'supersede the objects of' Disney's derivative [film trailers]"); *Ringgold v. Black Entm't Television*, 126 F.3d 70, 79 (2d Cir. 1997) (no transformative use where defendants used plaintiff's copyrighted poster

to decorate a set for a television show "to make it more attractive to television viewers precisely as a poster purchaser would use it to decorate a home.").

In a similar vein, courts will also consider whether the defendant altered the copyrighted work "with new expression, meaning, or message." *Campbell*, 510 U.S. at 579. Here, PIL did not alter the original expression of Ty's copyrighted toys or licensed derivatives in any of the four categories of photographs. They are only used for decorative, aesthetic purposes and to help sell the books. These facts also weigh in favor of Ty, and to the extent that the group shots and individual photographs have some element of commentary in the later versions of the books, the commentary is nevertheless secondary and does not alter Ty's copyrighted toys with new express, meaning or message. *See Castle Rock*, 150 F.3d at 143 (fact that defendant so minimally altered plaintiff's original expression was "further evidence" of the accused work's "lack of transformative purpose."); *Campbell*, 510 U.S. at 587 ("We also agree with the Court of Appeals that whether 'a substantial portion of the infringing work was copied verbatim' from the copyrighted work is a relevant question . . . for it may reveal a dearth of transformative character or purpose under the first factor.").

A related inquiry in determining whether PIL's use is transformative is whether the books serve as a market substitute for Ty's products or licensed derivatives. *See Davis*, 246 F.3d at 175-76 (when considering market harm for purpose of determining whether use is transformative, if "secondary use, by copying the first, offers itself as a market substitute and in that fashion harms the market value of the original, this factor argues strongly against a finding of fair use."). Here, PIL's books were market substitutes for Ty's licensed books. PIL's books are similar types of books as Ty's licensed books; they were sold in similar channels of trade and marketed to similar audiences; and one of Ty's own licensees complained about *For the Love of*

*Beanie Babies* because it had to compete with PIL, which was not paying a license fee to Ty and could hence sell its books for a lower price than Ty's licensee, who was paying a royalty to Ty. These facts also indicate that PIL's use was not transformative.

Finally, as with the first prong of the first fair use factor, in determining whether a given use is transformative, courts will also consider whether the defendant seeks to profit from the use of the copyrighted material without obtaining a license. In *Elvis Presley Enters.*, the court found that the defendant's use of certain footage of Elvis in a film biography was not transformative because the defendant sought "to profit directly from the copyrights it uses without a license," by using the copyrighted clips "to profit at least in part from the inherent entertainment value of Elvis' appearances." 349 F.3d at 628. Other courts have similarly held. *See Davis*, 246 F.3d at 176 (defendant's use was not transformative where defendant "avoided paying the 'customary price' for using plaintiff's design and plaintiff suffered "market harm" through "loss of royalty revenue" and "diminution of his opportunity to license others"); *Ringgold*, 126 F.3d at 79-80 ("just as members of the public expect to pay to obtain a painting or a poster to decorate their homes, producers of plays, films, and television programs should generally expect to pay a license fee when they conclude that a particular work of copyrighted art is an appropriate component of the decoration of a set."). Because PIL did not pay the "customary price" of a royalty to Ty for using its protected materials, this also indicates that there was no transformative use.

For the foregoing reasons, PIL's use of Ty's copyrighted material is not transformative. Thus, both aspects of the first fair use factor weigh against fair use.

14

## 2.  Nature of the Copyrighted Work

The second fair use factor – the nature of the copyrighted work – is "highly relevant to whether a given use is fair." *Harper & Row*, 471 U.S. at 553.  This factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586.  Thus, "creative" works are deemed more deserving of protection than works that are "more of diligence than of originality or inventiveness" (*i.e.*, indexes, catalogs, or other compilations). *New York Times Co. v. Roxbury Data Interface, Inc.*, 434 F. Supp. 217, 221 (D.N.J. 1977).  Because Beanie Babies are creative, fictional works of visual art, this second fair use factor weighs in Ty's favor. *See Harper & Row*, 471 U.S. at 563 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."); *Brewer v. Hustler Magazine, Inc.*, 749 F.2d 527, 529 (9th Cir. 1984) ("The scope of the fair use defense is broader when informational works of general interest to the public are involved than when the works are creative products"); *Paramount Pictures Corp. v. Carol Publ'g Group*, 11 F. Supp. 2d 329, 336 (S.D.N.Y. 1998) (under the second fair use factor, "[t]he Star Trek Properties are creative works of fiction and are therefore entitled to the highest level of protection").

## 3.  Amount and Substantiality of the Portion Used in Relation to Copyrighted Work as a Whole

The third fair use factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  This inquiry must focus upon whether "[t]he extent of . . . copying" is consistent with or more than necessary to further "the purpose and character of the use." *Campbell*, 510 U.S. at 587.  This third fair use factor also

15

favors Ty because PIL used more of Ty's copyrighted works in *For the Love of Beanie Babies*
than was necessary for its alleged purpose of criticism and commentary or for producing a
marketable collectors' guide. Color photographs of Beanie Babies appear on the front and back
covers; in full-page fanciful group settings; and on the title page and tables of contents. None of
these uses was required for the ostensible goal of commentary or criticism. Moreover, PIL did
not need to use photographs of the same toys multiple times throughout all the four categories.
Finally, in connection with the individual photos, *For the Love of Beanie Babies* contains color
photographs of every item in Ty's Beanie Babies product line at the time of publication. These
photographs are in the form of large, glossy, color photographs, and they are the most prominent
points of visual interest on each page. Although some use would be considered necessary to
produce the marketable collectors' guide or to engage in meaningful criticism and commentary,
PIL clearly used more than was required to do so. For example, PIL could have identified the
toys by name (which it did in its own indexes) or style number; could have used small, black and
white "thumbnail" photographs to identify the toys; or only used photographs of the toys where
needed to show, for example, differences in the shading of colors between different versions of
the same toy or differences in certain features. PIL did not need to use oversize, glossy, color
photographs of every single item in Ty's Beanie Baby collection in order to "identify" the toys.
For all of these reasons, the third fair use factor also weighs in Ty's favor. *See Elvis Presley*
*Enters.*, 349 F.3d at 630 (third factor weighed in plaintiff's favor where defendant's use of Elvis
file clips "although in most cases of short duration, were repeated numerous times," and "[w]hile
using a small number of clips to reference an event for biographical purposes seems fair, using a
clip over and over will likely no longer serve a biographical purpose."); *Paramount Pictures*, 11
F. Supp. 2d at 336 (no fair use under the third factor where the "majority" of the book simply

recounted the Star Trek story: "[i]t is difficult to see how 168 pages can be devoted to illustration while the true purposes of the book is carried out by the book's remaining 49 pages."); *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1377 (2d Cir. 1993) (finding against PIL on the third fair use element: "What PIL lifted was plainly substantial in relation to the copyrighted works as a whole."); *Horn Abbot*, 601 F. Supp. at 367 (no fair use under third factor where trivial pursuit book copied the whole book).


4. Effect of Defendants' Use Upon the Potential Market for Plaintiff's Toys and Licensed Derivatives

      In connection with the fourth fair use factor – the effect of the infringement on a plaintiff's potential market – the Supreme Court stated:

> [This] requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market" for the original. The inquiry "must take account only of harm to the original but also of harm to the market for derivative works.

*Campbell*, 510 U.S. at 590 (citations omitted). Here, Ty has licensed at least seven publishers to publish books about Beanie Babies toys and has obtained royalties in excess of $2.6 million dollars in connection with these license agreements. PIL's books are – at the least – comparable to Ty's licensed books,[9] were sold in similar outlets, and were targeted to roughly the same market audience of Beanie Baby enthusiasts. One of Ty's major licensees even complained to Ty on more than one occasion about having to compete with PIL in connection with *For the Love of*

---

    [9] Just as *For the Love of Beanie Babies* contains glossy, color photographs of Ty's Beanie Babies plush toys on the covers and individually, with the photographs being the main points of interest in the books, the publications licensed by Ty have these same features with the same emphasis on the photographs.

*Beanie Babies*, because the licensee was paying a royalty to Ty whereas PIL was not, which placed Ty's licensee at a competitive disadvantage. Accordingly, this factor also weighs in favor of Ty. *See Twin Peaks*, 996 F.2d at 1377 (ruling that PIL's book "may interfere with the primary market for the copyrighted works and almost certainly interferes with legitimate markets for derivative works"); *Paramount*, 11 F. Supp. 2d at 336 (finding that defendant's *Joy of Trek* book could interfere with plaintiff's market for derivative works, where plaintiff had licensed a number of guidebooks that were derivative works).

PIL's Opposition to Ty's Summary Judgment Motion

In opposing Ty's motion, PIL first argues that the only real issue in this case is whether PIL's use of the photographs is a fair use "because it is the only way to prepare a collectors' guide," citing *Ty, Inc.*, 292 F.3d at 522. In essence, PIL contends that the traditional fair use consideration do not apply or have already been resolved against Ty, and that PIL "must be able to use color photographs of all Beanie Babies precisely *because* Ty has licensed their use in competing guides." I will address each of these arguments in turn.

First, the Seventh Circuit has not resolved the fair use factors against Ty as they pertain to the three versions of *For the Love of Beanie Babies.* The Court noted that the "only question" for review was "whether PIL is entitled to a trial on its defense of fair use," 292 F.3d at 516, and the Court ultimately concluded that "[t]he proper characterization of PIL's Beanie Baby books is the kind of fact-laden issue appropriate for summary judgment only in extreme cases, which this case is not," *id.* at 519. Because the Court reversed and remanded the case for trial or partial summary judgment in connection with all the books at issue, the Court's cursory comments about the various fair use factors were not binding determinations on all of PIL's books as a collective

whole. In any event, the Court did not draw ultimate conclusions on every fair use factor, as PIL claims.

Moreover, regardless of what PIL claims the Seventh Circuit did, statutory and case authority mandate that the four fair use factors must be considered and applied in every case, including this remand. The Seventh Circuit itself recognized that "[i]n deciding whether a particular use is fair, the 'factors to be considered shall include'" the four factors listed in § 107, and the Court further acknowledged that "the four factors are a checklist of things to be considered." *Id.* at 522. In addition, the statute itself compels application of the factors in "any particular case." 17 U.S.C. § 107. Furthermore, the necessity of considering all four of the statutory fair use factors has been confirmed and applied by the U.S. Supreme Court, which has stated that Congress "listed four non-exclusive factors that a court must consider in determining whether an unauthorized use is not infringing." *Stewart*, 495 U.S. at 236-37; *Campbell*, 510 U.S. at 578. Although the Seventh Circuit may be critical of these four factors or believe that other factors warrant consideration as well (*i.e.*, such as whether unauthorized use of photographs is a fair use because it is the only way to prepare a "collectors' guide"), consideration of these factors is required.

To its detriment, however, PIL made no attempt to respond to Ty's application of the four fair use factors to *For the Love of Beanie Babies*.[10] Instead, PIL focused on whether its use of the photographs constitutes fair use because PIL's "collectors' guides" must be able to compete, as a matter of right, with "collectors' guides" which have been licensed by Ty. PIL's various arguments in support of its analysis reveal several misunderstandings on its part.

---

[10] Any arguments that PIL might have made (but did not make) on these individual factors are now waived.

As an initial matter, PIL presumes that "the task as delineated by the court of appeals" is whether "PIL's use of the photographs [was] the only way to prepare a successful collectors' guide in the then existing market." However, the Seventh Circuit delineated no such task. The Court defined the issues presented as "whether PIL copied more than it had to in order to produce a marketable collectors' guide" and "whether it would be unreasonable to conclude, with reference to one or more of the enjoined publications, such as the Beanie Babies Collectors' guide, that the use of the photos is a fair use because it is the only way to prepare a collectors' guide." *Ty, Inc.*, 292 F.3d at 521-22. There is a difference between preparing a "marketable collectors' guide" (as stated by the Court of Appeals), and preparing a "successful collectors' guide" in an "existing market" (as PIL claims).

However, even if *For the Love of Beanie Babies* can be considered a "collectors' guide" (thus meaning that some amount of unauthorized use of the photographs would constitute fair use),[11] the right to copy for the purpose of commentary or criticism is not unlimited. In *Chicago Board of Educ. v. Substance, Inc.*, 354 F.3d 624 (7th Cir. 2003), the Seventh Circuit rejected a defendant's reliance on *Ty, Inc.* to support its claim that it could engage in unlimited copying because its purpose in copying unpublished standardized tests was to criticize those tests. The Court stated that the defendant "overreads our decision in *Ty, Inc. v. Publications Int'l Ltd.*, to

---

[11] There could be further discussion as to whether *For the Love of Beanie Babies* should be considered a "collectors' guide." The core problem with this designation is that whereas the central – if not exclusive – purpose of a prototypical "collectors' guide" is to provide collectors with valuable information about the objects of their collections, the central purpose of *For the Love of Beanie Babies* appears not to be to provide information about Beanie Babies, but rather to provide Beanie Baby collectors an additional outlet for their enjoyment of Beanie Babies, namely an aesthetically-pleasing and decorative book of photographs of Beanie Babies. Further discussion of this is unnecessary, however, because even if *For the Love of Beanie Babies* can be considered a "collectors' guide," there is no unlimited right to copy because of this designation, as described below.

hold that a purpose of criticizing creates a privilege of unlimited copying regardless of the harm

to the copyright owner's legitimate interests." *Id.* at 628. The Court concluded that the copying

in that case was not fair use because the harm that could come to the plaintiff school board from

the defendant's copying "was independent of any criticisms," namely, "the cost of creating

substitutes for the questions that [defendant] published and of extending the period of the pilot

program because his publishing the six tests prevented the board from asking any of the

questions in those tests in subsequent years." *Id.* Likewise, in the case at bar, PIL's *For the Love*

*of Beanie Babies* books cause harm to Ty that is independent of any perceived criticisms of Ty's

products within the books because the books contain the same type of gratuitous photographs of

Beanie Baby toys found in Ty's licensed books and interfere with Ty's statutory right, under the

Copyright Act, to create and license others to create derivative works based on its products,

including hard cover books featuring large glossy color photographs of its products on the covers

and in decorative settings and as the focal point of its pages – photographs that go beyond merely

identifying the toys for purposes of commentary or criticism.

Because PIL fails to realize that any so-called right to produce a marketable collectors'

guide does not encompass an unlimited right to unauthorized use of the photographs, it fails to

engage in what it lays out as the critical analysis framed by the Seventh Circuit – whether PIL

copied more than necessary to produce a marketable collectors' guide, or whether PIL's various

usages of the photographs were fair because their use was the only way to prepare a collectors'

guide. *See Ty*, 292 F.3d at 521-22. The standard for determining whether a claimed fair use for

purposes of criticism or commentary has gone too far is as follows:

> The general standard . . . is clear enough: the fair use copier must copy no more than is
> reasonably necessary (not strictly necessary – room must be allowed for judgment, and
> judges must not police criticism with a heavy hand) to enable him to pursue an aim that

the law recognizes as proper, in this case, the aim of criticizing the copyrighted work effectively.

*Chicago Bd. of Ed.*, 354 F.3d at 629. In *Chicago Bd. of Ed.*, the defendant presented no evidence of proposed evidence "to prove that he copied no more of the tests than he had to do in order to make his criticisms of them intelligible." *Id.* The Court of Appeals agreed with the district court that the defendant had no fair use defense as a matter of law because it could not explain why it copied the material that it did:

> [Defendant] insists that he had to copy six tests out of the 22 to 44 tests given in January of 1999 . . . in order to drive his criticisms home. But he does not explain why, or indicate witnesses or documents that might support such an argument. Granted that he had to quote some of the test questions in order to substantiate his criticisms, why entire tests? Does he think all the questions in all six tests bad? He does not say. What purpose is served by quoting the good questions? Again, no answer.

*Id.* at 629-30.

Here, the only plausible explanation for PIL's use of the various types of photographs of Ty's copyrighted products is that it needed to use them because other books in the market used similar types of photographs. However, apart from this improper justification reflecting a misunderstanding of the Seventh Circuit's ruling, this justification nonetheless fails to explain why PIL had to use large color glossy photographs of Beanie Babies toys on the covers of all three versions of its *For the Love of Beanie Babies* book; why it needed to include full-page group shots of toys placed in decorative fanciful settings in Versions 1 and 2 of the book; and why it needed to include decorative photographs of Beanie Babies toys on the title pages, table of contents and the pages opposite the full-page group shots in order to make its comments "intelligible." The fact of the matter is that PIL did not need to do so. Without drawing the line as to what amount of use of the photographs would be necessary to produce a marketable collectors' guide, it is clear that PIL clearly crossed any line that could reasonably be drawn. Its

22

use of these photographs had more to do with boosting sales by enticing Beanie Baby enthusiasts to purchase the books than with producing a marketable collectors' guide.

Indeed, this Court has already ruled, in a similar case involving PIL, that the inclusion of photographs of copyrighted materials on the cover, and decorative photographs in the filler pages, of a guide to the copyrighted work was not fair use, because the "sole purpose" of such photographs is to assist sales and "has no instructional value whatsoever." *Publications Int'l Ltd.*, 215 U.S.P.Q. at 862; *see also Viacom Int'l, Inc. v. Fanzine Int'l, Inc.*, 56 U.S.P.Q.2d 1363 (S.D.N.Y. 2000) (finding no fair use as a matter of law where defendant copied images of plaintiff's cartoon characters in a children's publication because, among other things, there was an "absence of accompanying text or commentary"). Accordingly, no jury could find that PIL's use was justified.

In connection with the fourth category, PIL misconstrues the Seventh Circuit's ruling by claiming "the circuit ruling permits the use of unauthorized color photographs of every single Beanie Baby in a collectors' guide." However, the Court did not go this far. Instead, it simply noted that a guide without any photographs or sketches of the toys, and that contained only a name and verbal description of each toy, "would sink like a stone in the marketplace." *Ty, Inc.*, 292 F.3d at 521. The Seventh Circuit remanded the case for a determination as to whether PIL could use the photographs in the manner that it did. If anything, the court recognized a continuum between a guide containing no photographs (which would allegedly "sink like a stone") and a "guide" that was "basically just a picture book" (which *For the Love of Beanie Babies* arguably is), and while the court suggested that PIL could probably use photographs to a certain extent for the purposes of identifying particular Beanie Babies that were the subject of commentary, it did not "hold," as PIL now claims, that PIL may use photographs of "all" Beanie

23

Babies and it certainly did not hold that PIL may use "color" photographs of all of them. *See Ty,*
*Inc.*, 292 F.3d at 521-23. To the contrary, I find that no jury could reasonably find that PIL
needed to use the photographs to the extent that it did in order to produce a marketable
collectors' guide.

Even assuming that the Seventh Circuit suggested that PIL could include photographs of
most Beanie Baby toys in order to identify the toys for purposes of comment or criticism or in
order to make its book marketable, it is evident that in all three versions of *For the Love of*
*Beanie Babies*, PIL's photographs of the individual toys are more than was "reasonably
necessary" to accomplish its alleged purpose of commentary or criticism. PIL uses large, glossy
photographs of each Beanie Baby toy, with two or three toys to a page. The photographs are
much larger than is reasonably necessary to merely identify what the toys look like, and there is
no need to use such large photographs of each toy, to use glossy color photographs of each toy,
for the photos to be the focal point of each page, or to mention the photos on the covers of the
book as selling points.

PIL's Motion for Summary Judgment

Along with Ty's motion for partial summary judgment in its favor as to the *For the Love*
*of Beanie Babies* books, PIL has simultaneously moved for full summary judgment in its favor as
to all books at issue here. As I did in deciding Ty's motion, I could go through a full fair use
four-factor analysis for each guide to determine whether a jury could reasonably find that each of
PIL's books constituted a fair use of the unauthorized photographs. However, for the sake of
brevity and as noted in my decision regarding Ty's motion, any finding of summary judgment,
either in favor or against either party, requires me to address "whether PIL copied more than it

had to in order to produce a marketable collectors' guide." *Ty, Inc.*, 292 F.3d at 521. As the Seventh Circuit elaborated:

> The question is whether it would be unreasonable to conclude, with reference to one or more of the enjoined publications, such as the *Beanie Babies Collector's Guide*, that the use of the photos is a fair use because it is the only way to prepare a collectors' guide.

*Id.* at 522.

In addressing Ty's motion, I concluded that the four fair use factors weighed against a finding of fair use for those books and, more importantly, that no jury could reasonably find that PIL did not copy more than it had to in order to produce a marketable collectors' guide in regard to the three versions of *For the Love of Beanie Babies*. In other words, the undisputed facts established that PIL copied more than it had to in order to produce a collectors' guide. Because my analysis led me to conclude that summary judgment was appropriate (thus precluding a jury trial on this issue), I explained my findings in great detail – certainly much greater detail than I provide here in denying summary judgment.

In contrast to Ty's motion, I cannot conclude that a jury would definitely find that PIL did not copy more than it had to in order to produce a marketable collectors' guide in regard to all the remaining books at issue. In other words, based on the record before me in regard to the remaining books, it seems equally plausible for a jury to conclude that PIL used more photographs than was necessary to produce a guide as for it to conclude that it did not.

Let me put this another way. In regard to the *For the Love of Beanie Babies* books, I am able to answer the question posed by the Seventh Circuit with a definitive "yes" as in "yes, PIL copied more than it had to in order to produce a marketable collectors' guide." In contrast, I cannot answer the question posed by the Seventh Circuit with a definitive "no" in regard to the

remaining publications as in "no, PIL did not copy more than it had to in order to produce a marketable collectors' guide."

For the reasons above, Ty's Motion for Summary Judgment Regarding *For the Love of Beanie Babies* is GRANTED, but PIL's Motion for Summary Judgment on Its Affirmative Defense of Copyright Fair Use is DENIED.

ENTER:

James B. Zagel
United States District Judge

DATE: 27 July 2004